Jason McDaniel, plaintiff in *propria persona*
7620 Englewood
Raytown, MO 64138
816-217-3288
jamcdaniel17@yahoo.com

FILED
U.S. District Court
District of Kansas

MAR 02 2023

Clerk, U.S. District Court
By _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**
Dole Courthouse; 500 State Ave, Room 259; Kansas City, KS 66101

JASON MCDANIEL,
PLAINTIFF,

v.

CASE NO. **2:23-cv-02090-TC-TJJ**

LAKEVIEW VILLAGE, INC.,
DEFENDANT.

_____/

## COMPLAINT FOR DISABILITY DISCRIMINATION AND RETALIATION

Jason McDaniel  ("plaintiff"), sues Lakeview Village, Inc. ("defendant") for violations of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), *42 U.S.C. §12101, et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs. Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under *29 CFR Part 1630, et seq.*

### I. JURISDICTION

1. This court has original and exclusive jurisdiction over plaintiff's claims pursuant to *28 U.S.C. §1331*, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; *42 U.S.C. §12101* and *42 U.S.C. §12112(a), (b) and (d)(4)* as it pertains to "discrimination"; as implemented by *29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d)* as it pertains to adverse employment actions, employers and medical examinations and interventions.

2. Venue is proper in this judicial district under *28 U.S.C. §1391* because defendant does business in this judicial district and the acts complained of took place in this judicial district.

3. All conditions precedent to jurisdiction have occurred or been complied with.

    a) A charge of employment discrimination on the basis of disability was filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practice alleged herein, namely on or about the date of January 20, 2022.

    b) A Notification of Right to Sue was received from the EEOC on April 29, 2022.

    c) A complaint was filed in the District court of Missouri on July 26, 2022 within 90 days of receipt of the EEOC's Notification of Right to Sue[1], thereby satisfying the condition.

4. Plaintiff has exhausted all administrative remedies available to him.

## II. PARTIES

5. Plaintiff is a citizen of the United States and resides in Raytown, Missouri at the address of 7620 Englewood.

6. Plaintiff is an individual with a "disability" as that term is defined in *29 CFR 1630.2(g)(1).*

7. Defendant employs 15 or more employees and is an "employer" within the meaning of *29 CFR 1630.2(e)* and has its principal place of business at 9100 Park Street, Lenexa, Kansas 66215 for all times material to the facts giving rise to the complaint.

8. Defendant receives funding from Medicaid and Medicare thus its funding is dependent upon it demonstrating compliance with the ADA.

9. All the discriminatory employment practices alleged herein were committed within the state of Kansas.

## III. PLAIN STATEMENT

10. Plaintiff is claiming defendant discriminated and retaliated against plaintiff based upon disability. When plaintiff objected to his employer imposing non-job-related medical inquiries and treatments without first conducting the required individualized assessment in order to determine whether he was a direct threat, the employer took adverse employment actions outlined in the policy itself.

## IV. STATEMENTS ON DEFENDANT'S "COVID POLICY"

---

1   A true and correct copy of the EEOC's Right to Sue Letter is alleged and included as Exhibit A.

11. Since 2021, defendant adopted measures known collectively as its "Covid policy", which includes requirements that employees submit to medical examinations, take experimental "Covid vaccines", wear surgical masks, practice isolation and segregation, and disclose vital statistics as new conditions of employment.

12. Defendant admits that its "Covid policy" is intended to treat and prevent the spread of a deadly, contagious disease.

13. The "Covid policy" assumes that every employee, plaintiff included, has or could have a deadly, contagious disease. The policy assumes that all of its employees are simultaneously at risk and pose a risk to the health of all other employees.

14. The "Covid policy" is based upon the pure speculation and hypothetical belief that every employee of defendant is impaired with the same exact disability: a deadly contagious disease; or alternatively, every employee has weakened immune and respiratory systems which make them vulnerable to contracting a deadly, contagious disease.

15. The "Covid policy" assumes that all employees have an on-going and indefinite condition of contagiousness that warrants the mitigation measures outlined in the policy.

16. The "Covid policy" assumes that one person must take a medical treatment in order for another person's medical treatment to be effective.

### A. Defendant's "Covid policy" is not authorized.

17. Defendant assumes that it has a new legal duty and new legal authority, as well as the medical competence, to impose medical exams and treatments to mitigate a deadly, contagious disease.

18. The adoption of the "Covid policy" did not create any new legal duty nor delegate any new legal authority to the defendant for imposing any mitigation measures in the policy.

19. The "Covid policy" did not create any new legal duty for employees to comply with the policy measures.

20. Defendant has no proof of any financial responsibility (insurance, etc.) to demonstrate that it has acquired a new legal duty.

21. Defendant does not have proof of an insurance policy which compensates anyone for:

   a)  becoming infected with a deadly, contagious disease after complying with its policy; and

   b)  suffering any adverse health consequences as a result of complying with its policy.

**22.** Defendant's "Covid policy" does not contain any legal enforcement mechanism.

**23.** There is no new legislative authority which authorizes employers to demand non-job related medical inquiries and treatments as new conditions of employment.

**24.** The "Covid policy" cannot be considered mandatory.

**25.** The policy relies upon the <u>voluntary</u> compliance of employees; or alternatively, upon the employers' willingness to force submission to the policy in exchange for disaster funding.

**26.** The policy relies upon the <u>voluntary</u> compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments under Emergency Use Authorization ("EUA"), and to refuse non-job-related medical inquiries, tests or treatments (rights protected under the ADA).

**27.** A voluntary policy cannot trigger compulsory discipline and termination for non-compliance.

**28.** The "Covid policy" is not a legitimate workplace policy.

**29.** The policy inherently violates the ADA and the ADA-AA.

**30.** The policy inherently violates public health laws.

### B. Defendant's policy triggers violations of the ADA under the "regarded as" prong and the "record of" prong of the ADA.

**31.** The policy perceives all employees as perpetually contagious with a deadly disease unless the employee uses the policy-prescribed mitigation measures.

**32.** The policy regards all "untreated"[2] employees as disabled with a deadly, contagious disease without relying upon any individualized assessment.

**33.** The policy misclassifies all employees as having an impairment which needs treatment by the policy mitigation measures.

---

2  All employees who did not use the "mitigation measures" outlined in the policy are considered "untreated". These mitigation measures include wearing masks, taking "Covid tests", taking "Covid vaccines", quarantining, segregating, answering surveys, giving vital statistics, reporting "vaccine" status, waiving medical privacy, waiving informed consent.

34. The policy itself makes a record of impairment by misclassifying all "untreated" employees as impaired.

35. The policy makes a record of impairment which is not based upon individual assessment.

36. The policy misclassifies employees as impaired via the employer's written communications to employees.

37. The policy imposes mitigation measures upon <u>all workers</u> without considering an individualized medical assessment of an employee's health.

38. The policy has no provision to establish through individualized assessment[3] whether a particular employee poses any direct threat to the health of their co-workers.

39. The policy regards all "untreated" employees as "direct threats.

### C. Defendant's policy imposes prohibited disability-related and non-job-related medical inquiries and examinations.

40. The policy requires medical inquiries which inherently perceive employees as disabled with a contagious, deadly disease.

41. The policy asks representatives of defendant to make repeated medical inquiries of employees, the purpose of which is to determine whether an employee has a deadly, contagious disease.

42. The policy fails to describe how any provision of the policy is directly related to any single employee's essential job function.[4]

43. The policy fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee.

44. None of the disability-related medical inquiries, tests and treatments are related to the essential job function of the employee.

45. None of the non-job-related medical inquiries, tests and treatments are permitted under *29 CFR Part 1630.13(b)*.

---

3   29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

4   defined in 29 CFR 1630.2(n)(2)(i) as "the reason the position exists".

**46.** Any employee who refuses the prohibited medical inquiries is regarded as disabled with a deadly, contagious disease.

**47.** The policy fails to include provisions for protecting the medical privacy of employees.

**48.** The policy fails to provide informed consent to employees.

### D. Defendant's policy lacks procedures and guidance necessary for ADA compliance.

**49.** The policy fails to provide guidance for defendant to remain compliant with the ADA when implementing the new "Covid policy".

**50.** The policy fails to provide any provision or guidance for defendant on how to handle employees who refuse the policy based upon claiming their rights protected under the ADA.

**51.** The policy fails to outline the process for defendant to follow if an employee claims protected status under the ADA.

**52.** The policy does not include an ADA compliant appeals process, employees have no redress.

**53.** The policy fails to instruct defendant on how to properly claim and prove an exemption to its duties under the ADA.

**54.** The policy fails to instruct defendant on the process of showing by financial records, that it would suffer an undue financial burden for an employee's refusal.

**55.** The policy fails to instruct defendant on the process of documenting fundamental alterations to defendant's normal operations caused by an employee's refusal.

**56.** The policy fails to instruct defendant on how to properly perform a direct threat assessment.

### F. Defendant's policy deceptively mischaracterizes non-job-related inquiries, tests and treatments as ADA "accommodations".

**57.** The policy fails to offer any accommodations[5] whatsoever that are cognizable under the ADA, specifically in *29 CFR Part 1630.2(o)*.

**58.** Defendant deceptively mischaracterizes "medical exemptions" and "religious exemptions" as accommodations[6].

---

5  Accommodations are defined in *29 CFR Part 1630.2(o)* as job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

59. These "exemptions" fail to meet the statutory requirements of ADA compliant accommodations because the "exemptions" are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

60. The policy also deceptively mischaracterizes non-job-related medical tests, inquiries and treatments as accommodations.[7]

61. The policy imposes measures deceptively misclassified as "accommodations" which are actually non-job-related and disability-related medical inquiries, tests and treatments.

62. The policy fails to instruct employers that any employee may refuse any accommodation which is not related to their essential job function.

63. The policy fails to instruct employers that any employee may refuse any accommodation when the employer does not have a *bona fide* exemption from its legal duties under the ADA, *29 CFR Part 1630.15(d)*.

64. The policy fails to include guidance for employers on how to process employee refusals to the policy while maintaining compliance with the ADA.

**G. Defendant's "Covid policy" imposes disparate treatment upon "unvaccinated" employees and upon employees who claim protected status.**

65. The policy is not uniformly or universally applied to all employees.

66. One of the mitigation measures established by defendant's "Covid policy" is a vaccination mandate.

67. On the basis of compliance with this non-job-related medical inquiry and treatment, the policy identifies six types of employees: (1) "vaccinated"; (2) "unvaccinated" with a medical exemption; (3) "unvaccinated" with a "religious exemption"; (4) "unvaccinated" with no request for "exemption"; (5) "unvaccinated" with no request for accommodation; and (6) "unvaccinated", and claiming their rights under the ADA.

68. Defendant's "Covid policy" intentionally discriminates against "unvaccinated" employees by treating them as if they are perpetually contagious with a deadly, contagious disease.

---

6 "Medical exemptions" and "religious exemptions" do not qualify as accommodations and the criteria for them is not disclosed, is arbitrary and has no review process. See *29 CFR Part 1630.2(o)(1)(ii)*

7 "Covid vaccines", temperature checks, "vaccine attestations", weekly "Covid tests", wearing masks, and quarantine, are not job-related modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of the position.

**69.** Defendant's "Covid policy" is also disproportionally applied to individuals who claim protected status.

**70.** Protected status is claimed by invoking rights under the ADA by claiming a violation of the ADA.

**71.** Claiming protected status constitutes protected activity under *42 U.S.C. § 12203(a)*; and places the claimant in a protected class.

**72.** The defendant's policy fails to respond appropriately to employees claiming protected status.

**73.** The policy fails to provide guidance to employers on how to process employees who claim protected status.

### H.  This is a case of first impression and an exceptional condition exists.

**74.** This is a case of first impression.

**75.** This is a case of "first impression" because plaintiff has exercised his rights to medical privacy and informed consent to refuse the "Covid policy's" medical treatments.

**76.** These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d)* for the reason that these rights are <u>intangible private property rights of people</u>, and of plaintiff specifically, and are protected by law and are not originated or granted by any statute.

**77.** These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**78.** Defendant's "Covid policy", which is not authorized by any statute, overcame established rights that form the bedrock of modern society.

**79.** This is also a case of "first impression" because plaintiff, in using the ADA to protect his rights, has asked the question: how did defendant suddenly acquire a new legal authority or legal duty to treat plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that defendant never did acquire any such legal duty or authority.

**80.** This is also a case of "first impression" because, while defendant makes the noble-sounding but disingenuous claim that their "Covid policy" is intended to prevent the spread of "Covid", it has absolutely no financial responsibility to engage in or administer such a policy.

8

81. In fact, employers may adopt a "Covid policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

82. This is additionally a case of "first impression" because, if defendant actually had the novel and *bona fide* legal right to require plaintiff to disclose his medical records, then defendant would have the right to simply obtain the name and address of plaintiff's physician and request such records directly from the physician.

83. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

84. An "exceptional condition" exists with this case which must be acknowledged. When the United States District Court itself has adopted the same policies as defendant, it begs the question: can the Court be impartial?

## V. STATEMENTS OF FACT

85. From August 2018 until his termination on April 14, 2022, plaintiff was employed by defendant as a Living Well Instructor. His job functions included leading and instructing group fitness classes.

86. Every day before plaintiff started his shift, his employer told him to fill out a questionnaire asking questions regarding his "symptoms", whether he had traveled out of the country, and whether he was "Covid vaccinated". Defendant claimed it could cancel plaintiff's work shift based upon his responses because it assumed it could make a medical diagnoses based upon the answers.

87. Since April 23, 2021, plaintiff received multiple weekly emails from defendant's executive team which stated that defendant would not allow plaintiff to perform his job duties unless he complied with the mitigation measures prescribed by the "Covid policy", which including taking experimental injections. These coercive emails showed: (1) defendant regarded plaintiff as disabled with a contagious disease, and as substantially limited with impaired immune and respiratory systems; (2) defendant regarded plaintiff as a "direct threat" with no medical diagnosis; and (3) defendant harassed and threatened plaintiff with retaliation if he did not comply with its "Covid policy".

88. Beginning August 6, 2021, the executive team sent plaintiff weekly update letters stating all employees classified as impaired because they are "unvaccinated" would be required to wear masks which differentiated them from other employees visually, and they would be required to submit to weekly medical examinations that were not job-related. The sheer volume of emails plaintiff received with this discriminatory information constituted harassment.

89. In October 2021, plaintiff received multiple letters from the executive team coercing him to get an experimental "vaccine" reportedly because "the family members of residents" requested it, which was coercive and manipulative language designed to make plaintiff alter his personal health choices.

90. On November 8, 2021, plaintiff received an email from Pam Hermon, COO, stating that the only recognized exceptions to "Covid vaccination" would be limited to medical and/or religious "exemptions". Defendant failed to recognize plaintiff's rights to informed consent and to refuse experimental injections. Ms. Hermon's email did not provide an option for plaintiff to exclude himself from defendant's "Covid policy" by claiming his rights under the ADA.

91. On November 17, 2022, plaintiff, who had been refusing the measures consistently,  filed a "Notice of discrimination and harassment based upon disability" with Mechelle Moffitt, HR Director and Libby Eilers, HR Generalist through the HR Department. Plaintiff took the step to formally invoke his rights under the ADA and claim his personal property rights. Plaintiff specifically stated that he did not need a medical or religious "exemption" to the policy because he refused the measures based on claiming his rights. Plaintiff noticed his employer that he never waived his rights and he claimed protected status under the ADA.

92.  In this notice plaintiff let his employer know that it was regarding him as disabled with a contagious disease and as having impaired immune and respiratory systems. Plaintiff requested Mechelle Moffitt to give him a copy of the individualized assessment defendant was relying upon to consider him a direct threat. Plaintiff claimed that the evidence of being regarded as a contagious direct threat was (1) demonstrated by the mitigation measures imposed by the "Covid policy", and (2) by the threats of adverse employment actions as a result of refusing non-job-related medical inquiries and treatments.

93.  Plaintiff also asked Mechelle Moffitt to provide him with answers to several questions that would assist in establishing the claimed legal authority behind the policy and provide him with informed

consent.  He specifically asked for proof of liability insurance for the mitigation measures, as this would show whether his employer had any duty of care. He asked to be shown a risk/benefit analysis of all the mitigation measures which were under Emergency Use Authorization and may be refused. He asked to receive a notice on how the mitigation measures were an essential function of his job. Plaintiff never received any of these answers from his employer.

94. The defendant also did not stop imposing the measures on the plaintiff so plaintiff filed an EEOC Charge of Discrimination with the Kansas City Office on January 20, 2022.  He also sent Mechelle Moffitt and Robbie Clausen, the CEO a copy of the charge hoping it would stop the harassment and coercion to get injections or submit to weekly tests and masking. He sought to protect his job by asking the EEOC to investigate.

95.  One week later, on January 27, 2022, plaintiff received an email from Mechelle Moffitt, HR Director, stating that defendant would fire him on February 14, 2022 if he did not get "vaccinated for Covid-19". Despite full awareness that plaintiff had asked for an EEOC investigation and was claiming disability rights and protected status, the defendant retaliated against him.  It also insisted that it would only recognize a medical or religious "exemption".   HR continued to refuse to recognize plaintiff's exclusion to the policy under the ADA, and he continued to be threatened with adverse employment actions despite opening up an EEOC investigation.

96. Plaintiff emailed Ms. Moffitt that he was owed six weeks accrued vacation pay as well and asked to receive these amounts.  Ms. Moffitt agreed to process his request to begin on February 15th but warned him that defendant would start looking for a replacement for his position and his termination was moving forward.

97. On February 4, 2022, plaintiff clarified to Ms. Moffitt in an email that he had requested assistance from the EEOC investigation process to protect his job and included another copy of his EEOC charge for her reference.  He asked her to honor his protected opposition status by pausing the termination process while the EEOC investigation took place.  He again stated that he claimed his exclusion to the policy under the ADA and asked her to honor this exclusion.  He mentioned that he was concerned that the company was offering him bad legal advice by insisting that he could only use the method of claiming a "religious or medical exemption" since he had not received any proof of legal duty showing the authority under which the employer claimed its enforcement authority. Plaintiff questioned whether he needed an exemption if there was no proof of legal duty. Whereas

plaintiff expressed his refusal of non-job-related medical inquiries, tests and treatments based upon an actual statute.

98. On Friday, February 11, 2022, plaintiff was coerced by Ms. Moffitt into starting his "unpaid leave of absence" earlier than the Monday, February 14, 2022 termination date, asking plaintiff not to come back on Monday. The termination, which was styled as an "unpaid leave of absence", thus began on February 11, 2022 and plaintiff had accrued sufficient vacation pay to receive the end of his benefit payments on March 29, 2022 for a total of 6 weeks.

99. On March 28, 2022, Mechelle Moffitt, HR Director contacted the plaintiff and reiterated that he could not return to work without requesting and receiving a medical or religious "exemption" or getting "vaccinated". Ms. Moffitt continued to place him on "unpaid leave" from March 29, 2022, until April 6, 2022, which constitutes retaliation for claiming his rights under the ADA.

100. In a letter dated April 1, 2022, the plaintiff's ADA advocate sent Ms. Moffitt a notice that confirmed plaintiff's concerns that he was being denied his rights to claim exclusion from the policy under the ADA. The ADA advocate stated that the policy appeared to be asking for non-job-related medical inquiries, tests and treatments and that the inquiries and treatments did not appear to be required to perform his essential job functions. The ADA advocate also stated that since the employer had failed to give any notice to the employee revising his job functions this supported the claim that the measures had not been vetted for ADA compliance. The advocate also let Ms. Moffitt know that it was important for the company to ensure that it was following ADA-compliant procedures with an employee in a protected class.

101. On April 7, 2022, plaintiff sent an email to Ms. Moffitt to notify her that he was planning to return to work on April 8, 2022. Plaintiff did not want to be accused of abandoning his job. He explained to Ms. Moffitt that plaintiff's ADA advocate had reached out to Francesca Simoncelli, Lakeview's legal counsel, that same day with a request for documents showing Lakeview's compliance with the ADA or showing Lakeview's valid exemption to the ADA. Plaintiff suggested to Ms. Moffitt that while this discussion was in process that no adverse employment actions be taken against him. Francesca Simoncelli did not provide any proof of compliance or exemption.

102. On April 13, 2022, plaintiff attended an EEOC Mediation meeting with Michael Talbert, an EEOC alternative dispute resolution specialist. The meetings was also attended by two Lakeview lawyers, and plaintiff's ADA advocate. Defendant's lawyers claimed that Lakeview risked getting

its Medicare funding removed if plaintiff did not get "vaccinated". Plaintiff's ADA advocate countered that the exact opposite was true: that Lakeview was risking its federal funding by discriminating against plaintiff.

103.    Next, Michael Talbert asked plaintiff to specify his desired outcome of the mediation meeting. Plaintiff suggested that Lakeview alter its signage to state that masks would be <u>allowed</u> rather than <u>required</u>. Plaintiff also stated that since anyone who wanted to take a vaccine could take one, and that he was not required to take the same treatment in order to make someone else's treatment effective, thus his employer should stop coercing him to take treatments. Plaintiff asked to be allowed to do his job without discrimination or harassment. Plaintiff's suggestions and requests were rejected by defendant's lawyers and the mediation did not resolve the dispute.

104.    On April 14 2022, plaintiff emailed Mechelle Moffitt to ask what his employment status was after the mediation. Plaintiff stated that he would continue to refuse mitigation measures for the disability he was perceived as having.

105.    Ms. Moffitt sent plaintiff a termination letter stating he was being fired for "not receiving the vaccine". This shows that plaintiff was fired for disability-related reasons. Ms. Moffitt's letter incorrectly stated that plaintiff was not disabled, despite plaintiff repeatedly informing defendant that it was regarding him as disabled and making a record of this disability, which qualified him for protection under the ADA.

106.    On April 29, 2022, plaintiff received a right to sue letter from the EEOC.

107.    A true and correct copy of all written communications are attached in Exhibit A.

### VI. LEGAL STANDARDS

108.    **Discrimination on the basis of disability.** Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to...hiring, advancement, discharge...and other terms, conditions and privileges of employment." *42 U.S.C. §12112(a).*

109.    To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he

was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

110.    **Retaliation on the basis of disability.** Title I of the ADA not only prohibits employment discrimination on the basis of an individual's disability, but it also prohibits retaliation against any individual who has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under the ADA." *42 U.S.C. §12203(a)*.

111.    To state a claim for ADA retaliation, a plaintiff must allege that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity. A plaintiff must allege that his protected activity was the but-for cause of the adverse employment action.

## VII. CLAIMS

**Count I. Defendant discriminated plaintiff on the basis of disability.**

112.    The ADA directs courts to construe the definition of "disability" broadly "in favor of expansive coverage to the maximum extent permitted by the terms" of the statute.

113.    The ADA-AA also establishes that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *29 CFR 1630.1(c)(4)*.

114.    Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one.

115.    Plaintiff alleges that: (1) his former employer employer is a covered entity subject to the ADA; (2) he is "disabled" within the meaning of the ADA; (3) he was qualified to perform his essential job functions; and (4) he suffered adverse employment actions because of his disability.

**A. Plaintiff's employer is subject to the ADA.**

116.    Defendant is a covered entity as defined under *29 CFR 1630.2(e)(1)*.

14

**B. Plaintiff is disabled within the meaning of the ADA.**

117.    Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

**1. Defendant regarded plaintiff as disabled.**

118.    An individual is "regarded as" having a disability if he: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes or actions of others toward such impairment; or (3) *has no such impairment but is treated by a covered entity as having a substantially limiting impairment*.

119.    Under the ADA, the standard for a "regarded as" disability claim simply requires the individual to establish that he has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *42 U.S.C.S. § 12102(3)(A)*.

120.    For a "regarded as" claim a plaintiff does not need to plead whether the impairment substantially limited a major life activity. Whether a plaintiff is regarded as disabled turns on *the employer's perception of the employee as demonstrated by the actions it took*.

121.    What matters for the 'regarded as' theory is whether the employer perceived plaintiff as impaired, not whether he was actually impaired. This more liberal standard makes it significantly easier for a plaintiff to show disability.

122.    In this case, plaintiff is claiming that his employer, through the "Covid policy", treated him as if he had a substantially limiting impairment, that is, a deadly, contagious disease, or else, a suppressed immune system that makes him prone to contracting a contagious disease that can be transmitted to others.

123.    Through its "Covid policy", defendant regarded and treated plaintiff as if he had an on-going and indefinite condition of contagiousness that warranted the mitigation measures outlined in its policy.

124.   Defendant imposed several mitigation measures upon plaintiff that, in light of defendant's "Covid policy" were unnecessary in order for him to able to perform his essential job functions, including "testing", "vaccination", and mask-wearing.

125.   When plaintiff refused said mitigation measures, that were imposed without any individualized assessment, he was erroneously misclassified as unfit to perform his job and was forced to use his paid time-off, take unpaid leaves of absence, and was ultimately terminated.

126.   Defendant's perception that plaintiff had a disability was formed without an individualized assessment or any *bona fide* medical diagnosis.

127.   For defendant, it was not relevant if plaintiff actually had the contagious disease, as it imposed mitigation measures regardless.

128.   The mere perception that plaintiff was a direct threat because he refused mitigation measures was sufficient for defendant to consider that plaintiff had an impairment that substantially limited his ability to perform his job functions.

129.   Defendant refused to allow plaintiff to continue working without first submitting to its discriminatory "Covid policy". Therefore, it was actually defendant's "Covid policy" that impaired plaintiff's ability to perform his essential job functions by imposing mitigation measures that created a physical impairment that substantially limited plaintiff's ability to engage in major life activities, such as working.

**2. Defendant made a record of disability by misclassifying plaintiff as impaired.**

130.   To state a prima facie disability claim based on a "record of" a disability, a plaintiff must plausibly allege a "history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, *or was misclassified as having had such an impairment.*" *29 C.F.R. § 1630.2(k)(2) (emphasis added)*

131.   Defendant made a record of disability by classifying plaintiff as an "untreated" employee, because he refused "Covid vaccines", mask-wearing, and "PCR testing". Based upon this record, defendant took several adverse employment actions towards plaintiff. Defendant repeatedly harassed and threatened him with termination and unpaid leave; imposed prohibited medical

examinations, treatments and inquiries; and terminated plaintiff's employment for reasons of disability.

132.   This is a case of a perceived disability, thus it follows that the record of disability made in this case is of a perceived disability. Defendant made a record of its perceptions and admitted that it kept a lists of employees who were "unvaccinated", who did not wear masks or submit "PCR testing" results to the employer.

133.   Defendant further insisted that employees misclassified as impaired because they were classified as "unvaccinated" would be required to wear particular masks which differentiated them from other employees visually, and they would be required to submit to weekly medical examinations. This clearly demonstrates that the employer classified and regarded these employees as still contagious/impaired, while "vaccinated" employees were no longer classified and perceived as contagious/impaired.[8]

134.   It is evident that one way the employer was misclassifying plaintiff was by gathering "vaccine status" records. However, the "unvaccinated status" is not the disability; rather the fact that defendant made a record of the "vaccine status" provides proof of a claim under the "record of" prong.

135.   Defendant, by its own policies, attitude toward plaintiff, written communications, method of record-keeping and general treatment of plaintiff, created a set of facts that satisfy the criteria under the ADA's "regarded as" and "record of" disability prongs.

**3. Defendant breached plaintiff's rights protected by the ADA by imposing its "Covid policy" upon him.**

**(a) Defendant required non-job related medical examinations and treatments of plaintiff that were not consistent with any conceivable business necessity.**

136.   It is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability, except when it is job-related and consistent with business necessity or they relate to the ability of an employee to perform job-related functions. *29 CFR § 1630.13(b) and § 1630.14.*

---

8   The "Covid-19 vaccine" does not claim to prevent infection or provide immunity. It is non-sensical to insist that plaintiff take a "Covid-19 vaccine" for the benefit of someone else's health. It is only advertised to "lessen symptoms" which only provides a benefit to the user.

137.   Defendant required non-job-related medical examinations and disability-related inquiries of plaintiff that were not consistent with any conceivable business necessity and not permitted under *29 CFR Part 1630.13(b)*.

138.   Defendant's "Covid policy" imposed certain non-job-related and disability-related medical inquiries on plaintiff including, but not limited to: questionnaires regarding "symptoms" and "vaccination status", and weekly "Covid-19" testing, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

139.   This practice results in the absurd situation of relying upon a lay-man's "diagnosis" or "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

140.   Defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace.

141.   However, defendant never consulted any *bona fide* or competent medical professional regarding the involuntary application of its "Covid policy" upon its employees.

142.   Defendant's "Covid policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental "vaccines" and wearing a surgical mask over the face.

143.   Defendant's "Covid policy" imposed certain non-job-related and disability-related medical inquiries and tests including, but not limited to: "symptom" surveys, regular "Covid testing", "vaccine status".

144.   These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related and disability-related; in addition defendant is trespassing on plaintiff's medical privacy rights and informed consent, both of these issues are expressed in the ADA.

145.   Defendant has not provided proof that a "Covid-19 vaccine" prevents infection and transmission of a disease as defined by modern scientific standards.

146.   Defendant has not provided proof that taking the "Covid-19 vaccine" would prevent anyone other than the user from experiencing symptoms.

147.    A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

148.    The "Covid-19 vaccines" demanded by defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental "vaccines" have been <u>approved</u> by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase.

149.    The only "Covid-19 vaccine" that is FDA-<u>approved</u>, Comirnaty, is not commercially available in the United States, should plaintiff choose to take it. [9]

150.    The "Covid policy" as implemented by defendant allowed un-skilled and unlicensed individuals to impose medical inquiries, tests and interventions upon employees because commentary on a website stated that such inquiries, tests and interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[10], EEOC[11], etc.).

151.    Defendant never provided notice of any kind to plaintiff, advising plaintiff as to the manner in which these medical treatments and medical inquiries were related to his essential job function.

152.    In fact, none of the mitigation measures were related to plaintiff's essential job function because he was able to continue performing his essential employment duties without participating in defendant's "Covid policy".

153.    Plaintiff also alleged in his testimony and in written communications[12] that he was both willing and able to continue performing his employment duties and that defendant's "Covid policy" was not related in any way to his essential job functions.

154.    These inquiries, tests and treatments were disability-related because they are designed to reveal or treat the disability perceived by the "Covid policy".

**(b) Defendant breached plaintiff's right to medical privacy.**

---

9    There is controversy as to whether the Moderna "Spikevax" formulation has actually received approval and it also is not commercially available.   Regardless, the EUA period is still in effect, as of the date of this filing it has not been rescinded by the FDA.

10 https://www.cdc.gov/other/disclaimer.html

11 https://www.eeoc.gov/disclaimer

12 A true and correct copy of which is alleged as Exhibit A.

155.   Information regarding the medical condition or history of an employee shall be treated as a confidential medical record and shall not be used for any purpose inconsistent with the ADA. *29 CFR §1630.14(c).*

156.   Defendant's "Covid policy" violates *29 CFR §1630.14(c)* of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status" and vital statistics and "PCR"[13] testing history) without any regard to confidentiality.

157.   The "Covid policy" includes no provision to preserve the medical privacy rights of any employee, including plaintiff's.

158.   Defendant's policy purportedly requires employees to examine themselves, make a self-diagnosis[14] and report the finding to the defendant as if it was a *bona fide* diagnosis; and upon which defendant intends to rely as if it was a *bona fide* diagnosis obtained by a licensed, qualified professional physician.

**(c) Defendant failed to conduct any individualized assessment to determine that plaintiff was a direct threat.**

159.   The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. *29 CFR § 1630.2(r)*

160.   Defendant failed to conduct any individualized assessment establishing that plaintiff was a direct threat.

161.   Defendant simply punished plaintiff for his good faith refusal to participate in its "Covid policy" on the pure speculation that plaintiff had a disability (deadly contagious disease).

162.   Defendant acted on the false premise that it had the legal duty and authority to protect plaintiff and everyone else from contracting such a disease (disability).

---

13 Polymerase Chain Reaction

14"Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

163.    Defendant claiming that plaintiff had a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, *29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d)*.

164.    Defendant cannot rely upon news or public announcements to determine that plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

165.    Defendant acted irrationally by regarding plaintiff and others as having an illness without any diagnosis, and then sought to treat everyone with the same medical intervention without any diagnosis.

166.    This behavior is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health.[15] The "Covid policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

167.    Additionally, defendant cannot allege that the medical treatments established in its "Covid policy" are necessary to guarantee the "safety" of its employees, when the treatments are non-job-related, the treatments imposed are only claimed to benefit the user, there has been no actual diagnosis of disease prior to imposing the treatments, and defendant offers certain employees the possibility of being "exempted" from certain treatments for medical or religious reasons.

**(d) Plaintiff was not required to request religious nor medical exemptions from defendant's Covid policy.**

168.    Plaintiff was not required to request exemptions from defendant's "Covid policy" for religious or medical reasons because none of its provisions were related to plaintiff's essential job function.

169.    Plaintiff was not required to request any accommodations or reasonable modifications because none of the "Covid policy's" provisions were related to his essential job function.

170.    While plaintiff had no duty to request any reasonable modification or accommodation to defendant's "Covid policy"; the plaintiff was deceptively informed that he must request a "religious or medical exemption".

---

15  Factitious Disorder or Munchausen Syndrome by Proxy.

171.   The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in *29 CFR Part 1630.2(o)* because the "exemptions" offered are not job-related adjustments to the workplace environment.

172.   Defendant's policy did not impose any new legal duties upon plaintiff from which he could have been exempted or needed to request exemption from.

173.   Defendant's deceptive "exemption" practice was only intended to give the appearance of fairness because it could arbitrarily deny or revoke exemptions.

174.   Defendant never disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which plaintiff was being "exempted".

175.   Plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

176.   Plaintiff was always protected under the ADA once he claimed his rights.

177.   Plaintiff is not required to use the language of the ADA to claim this protection, however plaintiff did specifically give notice to defendant that he was a qualified individual who was being regarded as having a disability by defendant's policy.

**C. Plaintiff was qualified to perform the essential functions of his job.**

178.   Plaintiff was qualified for his job as a Living well Instructor and had all the necessary credentials to carry out the required duties of his position.

179.   Plaintiff was obviously qualified for a job he was already doing, and he was willing to continue performing his job functions.

180.   Despite plaintiff's qualifications, plaintiff was denied equal access and was terminated.

**D. Plaintiff suffered adverse employment actions because of perceived disability.**

181.   An ADA plaintiff suffers an adverse employment action when he endures a materially adverse change in the terms and conditions of employment or when his rights are interfered with. Typical examples of adverse employment actions include refusal to recognize protected status, imposition of prohibited tests and inquiries, termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities.

182.    Plaintiff was threatened with termination, unpaid leave and refusal to enter his workplace if he did not comply with his employer's "Covid policy" and the employer imposed prohibited measures and refused to recognize his claim of protected status, especially after he opposed the policy and pointed out that the imposed mitigation measures were not compulsory by law. Ultimately, he was fired.

183.    The alleged above demonstrates that defendant discriminated against plaintiff on the basis of disability and fired him when he refused to submit to the imposed mitigation measures established by defendant's "Covid policy" based on the assumption that plaintiff was disabled <u>because he remained "untreated"</u>, and assumed therefore, that he did have or could have a deadly contagious disease, or else, had suppressed immune and respiratory systems that made him prone to contracting said contagious disease.

184.    Plaintiff's allegations satisfy the elements of discrimination and show that he falls within a protected group, that he is qualified for the position he held, that he was subjected to non-job-related medical inquiries, tests and treatments, and he was subject to adverse employment actions and that these adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**Count II. Defendant retaliated against plaintiff on the basis of disability.**

185.    Plaintiff engaged in activity protected by the ADA by opposing his employer's discriminatory "Covid policy", pointing out the defendant's ADA violations, and by arguing that defendant was not exempt from complying with the ADA.

186.    Defendant was aware of this protected activity.

187.    Defendant took adverse employment actions against plaintiff.

188.    Plaintiff's opposition and non-compliance of defendant's "Covid policy" was the only reason for the adverse employment actions, including his termination.

**A. Plaintiff engaged in activity protected by the ADA.**

189.   Plaintiff protested and opposed his employer's discriminatory "Covid policy" and defendant was aware that plaintiff engaged in such protected activity.

**1. Plaintiff protested and opposed defendant's discriminatory "Covid policy".**

190.   Defendant's "Covid policy" regards employees as disabled, and uses standards, tests, and criteria that screen out employees with perceived disabilities which thereby, constitutes disability discrimination, in addition to what is described in the following allegations.

191.   Plaintiff, in good faith, believed that defendant's "Covid policy" was unlawful because:

a)  it was not mandated by statute;

b)  it infringed upon his rights to property, bodily integrity, medical privacy, informed consent, and those protected under the ADA; and

c)  it was disproportionally applied to him once he refused the measures and opposed the policy based on his rights.

192.   As argued above, defendant's "Covid policy" is a failed policy because it does not include several necessary provisions to:

a)  remain compliant with disability law or address the needs of employees with disabilities.

b)  protect the medical privacy of employees, and specifically plaintiff's.

193.   Additionally, the "Covid policy" lacks any authorized enforcement provisions and relies either on plaintiff to voluntarily waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon defendant's willingness to force submission to policy in exchange for disaster funding.

194.   Defendant's "Covid policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

195.   Defendant terminated plaintiff specifically for not being "Covid vaccinated".

196.   It is not necessary to allege that defendant's agents personally regarded plaintiff as having a disability, defendant's "Covid policy" itself clearly demonstrates that defendant sought to impose the policy's provisions upon plaintiff based upon the pure speculation, stereotype and

generalization that he was infected or may in the future become infected with a deadly, contagious disease.

197.   Furthermore, defendant's "Covid policy" was not uniformly or universally applied to plaintiff once defendant began making a record of such disability by mis-classifying plaintiff as having an impairment which needed to be treated or cured by defendant's "Covid policy".

198.   Upon giving defendant notice that he was regarded as having a disability,[16] plaintiff identified himself as being within a protected group.

199.   Plaintiff claimed his rights to refuse defendant's mitigation measures through the process of good faith opposition and he engaged in a protected activity.

200.   Defendant imposed the policy on everyone equally but failed to recognize that plaintiff claimed protected status and thus was in a separate class to everyone else who had not invoked their rights under the ADA.

201.   Defendant imposed its "Covid policy" on everyone equally but failed to recognize that plaintiff gave notice of being regarded as having a disability.

202.   Defendant imposed its "Covid policy" on everyone equally but failed to recognize that plaintiff objected to submitting to non-job-related and disability-related medical tests, inquires and treatments.

203.   Defendant imposed its "Covid policy" on everyone equally but treated all those attempted to exclude themselves from the mitigation measures in disparate ways.

204.   As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because e*veryone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

205.   Plaintiff alleges that the following conduct constituted protected activity: filing a "Notice of discrimination and harassment based upon disability" with the HR department; invoking his disability, property, and informed consent rights; opposing the policy because of its non-compliance with federal law; refusing to request "exemptions" based on medical or religious

---

16 As an employee he is, of course, understood to be a "qualified individual".

reasons; giving notice that defendant's "Covid policy" was regarding him as disabled with a contagious disease and that his employer was misclassifying him as disabled because of his "treated" status; requesting his employer produce the individualized assessment it was relying upon to determine he was disabled and a direct threat to the health of others; filing a Charge of Discrimination to the EEOC; and getting an ADA advocate, inter alia.

206.    Plaintiff exercised his right to refuse defendant's "Covid policy" mitigation measures based upon a good faith belief that the policy did not apply to him because it violated the ADA and because of the foregoing alleged failure of defendant to establish any exemption or exception to its legal duty to comply with the ADA.

207.    Exercising this right is a protected activity and defendant's "Covid policy" was not equally or universally applied to plaintiff because he had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

208.    Plaintiff exercised his right to refuse defendant's policy measures based upon a good faith belief that the policy did not apply to him because the policy was not related in any way to his essential job function.

209.    Plaintiff exercised his right to refuse defendant's policy measures based upon a good faith belief that the policy did not apply to him because defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to his essential job function.

**2. Defendant was not exempt from complying with the ADA.**

210.    Regarding each incident of plaintiff's good faith refusal to accept defendant's "Covid policy" measures, and defendant's adverse response, plaintiff was in a protected class and engaged a protected activity, and was not required to participate in defendant's policy under 29 CFR Part 1630.9(d), unless defendant established an exemption or exception to its legal duty to comply with the ADA.

211.    Defendant failed to identify or describe any set of facts establishing that plaintiff's good faith refusal to participate in defendant's "Covid policy" would have created any undue financial hardship.

212.    Defendant failed to identify or describe any set of facts establishing that it would lose medicare funding because the plaintiff remains "untreated".

213.    Defendant will lose funding for being found non-compliant with its duties under the ADA.

214.    Defendant failed to identify or describe any set of facts establishing that plaintiff's good faith refusal to participate in defendant's "Covid policy" would have fundamentally altered normal business operations. In fact, defendant's policy has already fundamentally altered normal business operations.

215.    Defendant required non-job-related medical examinations of plaintiff that were not consistent with any conceivable business necessity.

216.    Defendant made disability-related inquiries of plaintiff that were not consistent with business necessity and not permitted under *29 CFR Part 1630.13(b)*.

217.    Defendant cannot claim the perceived disability is both "transitory and minor" because it retaliated against the plaintiff based upon perceiving the plaintiff as a "direct threat" with an on-going condition of contagiousness.

218.    If the perceived disability is **both** transitory **and** minor, such as having the common cold, defendant should establish the necessity of implementing such a draconian policy.

219.    There is no established end-date when defendant would cease regarding plaintiff in need of mitigation.

220.    Defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that plaintiff individually is a direct threat.

221.    To this day, defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including plaintiff.

222.    Defendant cannot claim that its perceived plaintiff as a "direct threat" of an undiagnosed contagious disease and simultaneously claim that its perception is both "transitory and minor".

223.   This perception has been ongoing since defendant implemented its "Covid policy". What matters in a "regarded as" claim is defendant's perception.

224.   Plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**B. Defendant was aware of plaintiff's participation in the protected activity.**

225.   Plaintiff claimed his rights and expressed his opposition on more than one occasion. He filed a discrimination notice with Human Resources and had sustained email communications with HR representatives. He filed an EEOC complaint. Plaintiff also had an EEOC mediation meeting with defendant. Therefore, it can be concluded that defendant was aware of plaintiff's participation in the protected activity.

**C. Defendant subjected plaintiff to materially adverse employment actions.**

226.   Plaintiff sustained adverse employment actions.

227.   Defendant's "Covid policy", as alleged herein and described in more detail in plaintiff's affidavit, describes materially adverse changes in the terms and conditions of employment, compared to the conditions of employment which existed prior to defendant's implementation of its "Covid policy".

228.   These changes did not simply create an inconvenience for plaintiff, they substantially altered the manner in which he was able to do his job and interact with co-workers by substantially impairing his ability to perform his essential employment duties.

229.   Each of the foregoing adverse employment actions resulted from every effort defendant undertook to coerce plaintiff into submitting to its "Covid policy" mitigation measures, and each adverse employment action described herein was causally related to plaintiff's good faith refusal of the mitigation measures.

230.   Each adverse employment action took place within moments of, or in direct response to, plaintiff claiming his rights, expressing violations of his rights and his good faith refusal to comply with defendant's policy.

231.   These facts demonstrate defendant's adverse employment actions derived from the "Covid policy" and defendant' failure to comply with the ADA.

232.   Defendant proceeded to harass plaintiff with countless emails coercing him into mitigation measures, including getting an experimental vaccine; forcing him to use his paid time-off while his salary was being withheld; threatening him with continuous unpaid leave while the matter was being investigated, refusing his entry to the workplace; and terminating him for refusing a non-job-related medical treatment, which are all actions that resulted in plaintiff's loss of assignment (job opportunities), income, and benefits.

233.   Ultimately, plaintiff was terminated for not complying with his employer's discriminatory "Covid policy".

**D. A causal connection exists between the adverse employment actions and the protected activity.**

234.   Upon giving defendant notice that he was a qualified individual regarded as having a disability, defendant began retaliating against plaintiff by imposing punitive measures and adverse employment actions upon him for his good faith refusal of mitigation measures and opposition to the policy.

235.   Defendant's implementation of the "Covid policy" was a direct and proximate cause of defendant's decision to terminate plaintiff's employment.

236.   Defendant implemented a policy which regarded plaintiff as disabled, plaintiff refused non-job-related mitigation measures and opposed the policy, and defendant responded with adverse employment actions. There was no other reason defendant terminated plaintiff's employment.

237.   Beginning from the moment he gave notice to defendant, plaintiff suffered adverse employment actions[17] and defendant continued attempting to impose its "Covid policy" upon plaintiff.

238.   Defendant ignored and denied his claim of disability, then retaliated against him for refusing non-job-related mitigation measures as alleged in plaintiff's affidavit.

239.   Defendant's "Covid policy" itself creates the causal connection between the imposed measures and the consequences for refusing them.

---

17 Under the ADA, adverse employment actions include any actions taken which interfere the with plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against plaintiff for claiming their rights.

240.    It is defendant's "Covid policy" itself which demonstrates that plaintiff was being perpetually classified as a "direct threat" because he remained "untreated" for a hypothetical disease.

241.    The policy itself issued deadlines and consequences which vividly demonstrate the causal connection between medical demands and adverse employment actions.

242.    The moment plaintiff refused non-job-related medical treatments and inquiries he was subjected to the above-mentioned adverse employment actions, and ultimately scheduled for the process of termination.

243.    Plaintiff's allegations satisfy the elements of retaliation by showing that he engaged in protected activity, that defendant was aware of plaintiff's participation in said protected activity, that defendant subjected plaintiff to adverse employment actions, and that there was a causal connection between the protected activity and defendant's retaliatory conduct.

244.    Plaintiff demands a trial by jury.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this _8_ day of March, 2023.


                                                            Jason McDaniel
                                                    Plaintiff in *propria persona*